**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>**Plaintiff,**<br>**v.**<br>**BRYANT STERLING FLORIE, JR.,**<br>**Defendant.** | **Case No. 26-CR-082-JFH** |

**OPINION AND ORDER**

Before the Court are two matters ripe for review. The first is the United States of America's ("Government") Notice of Intent to Admit Evidence as Res Gestae or Under Federal Rule of Evidence 404(b) ("Notice") [Dkt. No. 23], which Defendant Bryant Sterling Florie, Jr. ("Defendant") objects to [Dkt. No. 37]. The second is Defendant's Motion in Limine ("Motion") [Dkt. No. 42], which the Government opposes [Dkt. No. 45]. For the following reasons Defendant's objections to the Government's Notice are SUSTAINED IN PART and OVERRULED IN PART. Additionally, Defendant's Motion in Limine is GRANTED IN PART, DENIED IN PART, and HELD IN ABEYANCE IN PART.

**BACKGROUND**

On July 16, 2026, a federal grand jury in the Eastern District of Oklahoma indicted Defendant with (1) kidnapping "C.M." in Indian Country under 18 U.S.C. §§ 1201(a), 1151, and 1152, (2) kidnapping "C.M." in Indian Country under 18 U.S.C. §§ 1201(a), 1151, and 1153, and (3) possessing a firearm and ammunition as a felon in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(8). Dkt. No. 2. The following summarizes the factual recitation of Defendant's offenses and the investigation into those offenses from the Government's Notice. Dkt. No. 23.

On November 13, 2025, around 4:40 a.m., Terri Stillwell called 911 and requested an ambulance to come to her apartment in Shawnee, Oklahoma. Stillwell reported that a man came into her apartment, struck "D.G." in the head with a gun and wounded him, kidnapped C.M. at gunpoint, and left with C.M. in C.M.'s vehicle. Stillwell reported that she did not see the man hit D.G. in the head, but she did see the man assault C.M. and force her to leave at gunpoint.

When Seminole Police Department ("SPD") officers arrived to the apartment, they found Stillwell and D.G. with a bandage on his head. Stillwell recounted that she had heard a knock on her door, looked out and saw a man that she knew named Jeremy Robison, and opened the door. After she opened the door, an unknown man appeared and forced his way into the apartment. According to Stillwell, the unknown man had a blue gun, hit C.M. while telling C.M. "I'll kill you," and then kidnapped C.M. at gunpoint. D.G. told law enforcement that he was in bed with C.M. when the man came in and struck him. Body-camera footage recorded this conversation between D.G., Stillwell, and law enforcement.

D.G. was interviewed again at the hospital. During that interview, he said he woke up in the apartment to a man with a gun and flashlight shining in his eyes. D.G. said the man hit him in the head with the gun and stole his jewelry. D.G. said he did not get a good look at the man, but he believed the man was C.M.'s ex-boyfriend.

Sometime later that morning, C.M. called Stillwell's apartment. SPD Officer Manship called C.M. back, where C.M. stated she was okay but refused to say where she was or who she was with. She stated she would come to the police department to speak with him, but she never arrived. C.M.'s mother ("Peavler") later contacted law enforcement and told them that the man who took C.M. was Bryant Florie, Jr. Peavler also provided a text message chain between Peavler and Defendant Florie's cellphone number. Peavler had texted Defendant, stating, "you can't make

someone go with you if they don't want to." Pealver then received the following text messages from Defendant's phone number: "Mom im ok plz don't call the cops plz;" "He is gonna kill us both if u do plz don't im begging u;" "I love you im ok;" "Please trust me this is cissy:" "I love you so much I'm ok."

On November 15, Seminole Nation Lighthorse Patrolman Ballard observed a vehicle matching a BOLO description and license plate linked to C.M.'s vehicle. Based on the license plate number, he learned that the vehicle's registration was expired, so he conducted a traffic stop. At some point, two SPD officers also joined Ballard at the stop—Officer Grove and Officer Foster. During the stop, Ballard obtained the driver and passenger's IDs, which identified the driver as C.M. and the passenger as Defendant. Grove and Foster informed Ballard that C.M. was a reported missing person and Defendant had an active arrest warrant. So, the officers detained Defendant and removed C.M. from the vehicle. When they asked C.M. why she was reported missing, she responded that she did not know. When asked about being kidnapped, she responded that she was not being held against her will but that she did not want to make the situation worse.

C.M. consented to a search of her vehicle. Pursuant to that search, officers found two firearms— a loaded SCCY 9mm and ammunition in a green bag under Defendant's seat and a Charter arms .38 revolver in backpack in the backseat that contained documents with Defendant's name on them. Defendant started yelling at the officers, claiming that nothing in the vehicle belonged to him or C.M. Dispatch confirmed that Defendant had a former felony conviction, so the officers arrested Defendant for possession of a firearm after felony conviction.

Officer Manship interviewed C.M. later that morning. She told Manship that she had left her house in Holdenville, Oklahoma, to distance herself from Defendant because he was abusive. C.M. stated she had lived at Stillwell's apartment in Shawnee for a week or two before Defendant

showed up to Stillwell's apartment on November 13. C.M. said she woke up to Defendant in her room with a firearm. C.M. reported that she tried to grab her belongings while Defendant yelled at her, and had thought about running, but she ultimately did not because she was too scared and believed she could not get away. C.M. also told Manship that: "[I]t could have been a lot worse . . . I was thinking, God this is going to end so bad. It's either going to be me or him." C.M. further reported that visible bruises around her eyes and ribs were from Defendant hitting her while she drove. C.M. also said Defendant had a gun out and pointed it at her while she drove. Defendant reportedly told her he would kill her and himself if they were pulled over.

## ANALYSIS

### I. THE GOVERNMENT'S NOTICE [Dkt. No. 23]

The Government seeks to admit several of Defendant's prior felony convictions under Rule 404(b). Additionally, the Government seeks to admit Defendant's prior domestic abuse towards C.M. as res gestae or under Rule 404(b). Finally, the Government seeks to admit Defendant's assault on D.G. as res gestae. Dkt. No. 23. The Court addresses each category of evidence below.

#### A. Legal Background

Rule 404(b)(1) prohibits admission of evidence of other crimes or bad acts to prove a defendant's "character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, such evidence may be admissible for other purposes, such as proving "motive, opportunity, preparation, plan, intent, knowledge, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Courts consider the following factors in determining the admissibility of prior acts evidence under Rule 404(b): (1) whether the evidence is offered for a proper purpose; (2) its relevance; (3) whether the probative value of the evidence is substantially outweighed by its prejudicial effect; and (4) whether the Court can give a limiting

instruction if requested by Defendant. *United States v. Moran*, 503 F.3d 1135, 1144 (10th Cir. 2007) (citing *Huddleston v. United States*, 485 U.S. 681, 691 (1988)).

Res gestae evidence is evidence that is "inextricably intertwined with the charged crime such that a witness's testimony would have been confusing and incomplete without mention of the prior act." *United States v. Piette*, 45 F.4th 1142, 1155 (10th Cir. 2022). It includes evidence which is "part and parcel of the proof of the offense charged" and which "is necessary to a full presentation of the case or is appropriate in order to complete the story of the crime on trial by proving its immediate context." *United States v. Kimball*, 73 F.3d 269, 272 (10th Cir. 1995). Accordingly, "res gestae evidence is 'not subject' to Federal Rule of Evidence 404(b)'s prohibition on prior acts evidence." *United States v. Gallegos*, 111 F.4th 1068, 1092 (10th Cir. 2024).

**B. Evidence of Defendant's Prior Felony Convictions**

The Government seeks to admit five of Defendant's prior felony convictions under Rule 404(b). Dkt. No. 23 at 1-2. The Government argues that "[e]vidence of the defendant's prior convictions, sentences, and time served establish the defendant's knowledge of his status as a convicted felon," as well as his "lack of mistake or accident . . . as to his inability to possess firearms." *Id.* at 9. Defendant acknowledges that his felon status is relevant for proving Count Three of the Indictment.[1] But, he also states that he will concede that he was a convicted felon on November 15, 2025. Dkt. No. 37 at 5. Accordingly, pursuant to *Old Chief v. United States*, 519 U.S. 172 (1997), Defendant argues the Court should not "allow any mention of how many

[1] To support a conviction for his felon in possession of a firearm and ammunition charge, the Government must prove that Defendant (1) knowingly possessed a firearm and ammunition; (2) was previously convicted of a felony; (3) knew he was a convicted felon when he possessed the firearm and ammunition; and (4) that before he possessed the firearm and ammunition, the firearm had moved at some time from one state to another. *See* Tenth Circuit Pattern Criminal Jury Instruction 2.44 (last updated August 18, 2026).

convictions Mr. Florie had, the names of any of those convictions, any facts or description of the nature of those convictions, or the length of any sentences." *Id.*

Based on Defendant's representations, the Court assumes that he intends to stipulate to the following facts: (1) Defendant was previously convicted of a felony; and (2) Defendant knew he was a convicted felon on November 15, 2025. So, the evidence presented to the jury to support the second and third elements of his § 922(g)(1) charge shall be limited to this stipulation. This ruling is preliminary and subject to Defendant filing a stipulation with the Court pursuant to the Court's scheduling order. *See* Dkt. No. 28 at 3 (stating that stipulations are due to the Court by December 23, 2026). For now, this objection is SUSTAINED.

**C. Evidence of Defendant's Prior Abuse of C.M.**

Next, the Government seeks to admit evidence that Defendant abused C.M. before he kidnapped her on November 13. Dkt. No. 23. The Government argues this evidence is res gestae because it "show[s] the context of why C.M. was at the apartment in Shawnee" and her "efforts to get away from defendant." *Id.* at 7. The Government also contends it "provides context of C.M.'s state of mind during the kidnapping and her reasonable belief that she would be physically harmed if she tried to resist the defendant." *Id.* However, the Court agrees with Defendant that general allegations of abuse sometime in the past are not res gestae of the offenses occurring from November 13 to November 15. So, the Court must analyze this evidence under Rule 404(b).

The Government argues this evidence is admissible under Rule 404(b) to show Defendant's "motive and intent in kidnapping C.M." *Id.* at 9. Defendant's motive and intent are relevant, the Government contends, to show that the defendant kidnapped C.M. for some purpose." *Id.* at 10. This reasoning is conclusory and difficult to decipher. Because the Government has not satisfied

its burden under the first two *Huddleston* factors, Defendant's prior abuse cannot be admitted to show his motive and intent to commit the offenses.

However, the Government also asserts this evidence is admissible to show C.M.'s state of mind during the kidnapping. *Id.* at 9. The Government maintains that C.M.'s state of mind is "is of great consequence in determining that she was acting out of fear of the defendant and that she did not willingly leave the apartment with the defendant, nor did she willingly stay with the defendant during the course of the kidnapping." *Id.* at 10. "Involuntariness or coercion in connection with the victim's detention is an essential part of the offense" of kidnapping. Tenth Circuit Pattern Criminal Jury Instructions 2.55. And, the fact that C.M. fled from Defendant because he abused her suggests that she did not want to remain near Defendant and feared that he would harm her if she did not. Furthermore, the fact that he harmed her in the past likely made his threats to kill her during the alleged kidnapping more believable to her. Accordingly, his prior abuse is highly relevant to the element of coercion.

Importantly, the Government is not stating that Defendant is guilty of kidnapping *because* he abused C.M. in the past. Instead, the purpose and relevancy of this evidence is to show that C.M.'s propensity inference caused her to remain with Defendant out of fear. And that type of evidence is admissible under Rule 404(b). *See United States v. Wooten*, 377 F.3d 1134, 1143 (10th Cir. 2004) (affirming admission of defendant's prior threats against his wife under Rule 404(b) as relevant to the wife's consent for his kidnapping charge). So, even though Defendant would be prejudiced by the introduction of this evidence, that prejudice does not substantially outweigh the significant probative value relating to C.M.'s consent, especially where the Court can issue a limiting instruction. Accordingly, this objection is OVERRULED.

**D. Evidence that Defendant Struck D.G. in the Head**

Finally, the Government seeks to admit evidence that Defendant struck D.G. in the head with a gun when Defendant took C.M. from Stilwell's apartment. Dkt. No. 2. The Government argues this evidence is res gestae because it is "provides context for the crime, is needed for a full presentation of the case, and is appropriate to complete the story of the crime." Dkt. No. 23 at 7. It is also res gestae, the Government contends, because it "provides further context for C.M.'s fear of physical violence" and "show[s] coercion of C.M. and her involuntariness in going with the defendant due to her reasonable fear of the defendant." *Id.* at 7-8.

Defendant argues this evidence is not res gestae because the Government has not shown that C.M. knew about the assault. Because Stillwell saw Defendant hit C.M., but did not see Defendant hit D.G., Defendant argues the alleged assaults could have been committed at different times and locations within the apartment. Dkt. No. 37 at 12. Defendant also points out that the Notice never alleged that C.M. mentioned D.G. in any of her communications with law enforcement. *Id.* at 12-13. Because he believes the Government failed to establish that C.M. knew of D.G.'s assault, Defendant argues the Government cannot use that assault to provide context for her fear or coercion. *Id.*

Defendant's interpretation of the Notice is unpersuasive. Indeed, the Government alleged in the second paragraph of its Notice that: "D.G. stated that he was in the bedroom and in bed with C.M. when the man came in and assaulted him." Dkt. No. 23 at 3. So, even though the Government could have been clearer, the Government seems to allege that Defendant struck D.G. while C.M. was in the bedroom.

But let's assume C.M. was not in the bedroom when Defendant struck D.G. That means Defendant (1) entered the bedroom where D.G. and C.M. slept, (2) forced C.M. to leave the

bedroom, (3) struck D.G. without C.M. present, and (4) exited the bedroom and assaulted C.M. in a different location, which Stillwell saw. Consequently, C.M. and Stillwell would testify they were outside the bedroom while Defendant was in the bedroom with D.G. A juror would certainly wonder what happened between Defendant and D.G. during that period, why D.G. did not do more to defend C.M., or simply why Defendant disappeared. To avoid those questions, the Government would have to refrain from referencing D.G.'s presence in the apartment. But that would not explain Defendant's brief disappearance, nor would it explain why a male named D.G. later became part of law enforcement's investigation into the kidnapping. Either way, D.G.'s presence in the apartment that night, including his assault, "is needed for a full presentation of the case[ ] and is appropriate to complete the story of the crime." Dkt. No. 23 at 7. Accordingly, it is highly relevant, and that relevancy far outweighs any prejudice to Defendant. So, Defendant's objection is OVERRULED.

## II. DEFENDANT'S MOTION IN LIMINE [Dkt. No. 42]

The Court will now turn to Defendant's Motion in Limine. Defendant seeks to exclude five categories of evidence, each of which the Court will examine below.

### A. Out of Court Statements Made by Stillwell, D.G., Peavler, and C.M.

Defendant generally objects to the admission of Stillwell, D.G., Peavler, and C.M.'s out-court-statements to law enforcement or each other unless they testify at trial. Dkt. No. 42 at 4-8. The Government encourages the Court to delay ruling on the admissibility of these statements until the Government offers a proper witness and lays an appropriate foundation at trial. Dkt. No. 45 at 1. The Court agrees with the Government, but it appreciates Defendant's notice of potential Confrontation Clause issues. Accordingly, the Court will hold these requests IN ABEYANCE until the appropriate time at trial. Defendant may reraise his objections at that time.

**B. Usage of "Kidnap" or "Kidnapping"**

Next, Defendant seeks to prohibit the Government and its witnesses from using the terms "kidnap" or "kidnapping" at any point during trial except for noting that Defendant is charged with kidnapping. Dkt. No. 42 at 9. Defendant argues that the legal definition of "kidnap" is distinct from the common use of "kidnap." *Id.* And, because "[t]he lay people who will be serving as jurors will have no idea . . . that these words have anything other than an ordinary meaning . . . . every time they hear someone say that Mr. Florie 'kidnapped' C.M., they will get the message that he is guilty of the charged offense of kidnapping." *Id.* Defendant also argues that any witness who uses the term would be giving an ultimate opinion on the question of guilt in violation of Fed. R. Evid. 701(b). *Id.*

Defendant is charged with kidnapping. So, he is not unduly prejudiced by the Government stating in its opening and closing that he is charged with kidnapping, describing the elements of kidnapping, and explaining why the evidence will satisfy or satisfied the elements of kidnapping. Furthermore, the Government agrees not to excessively use "kidnap" during its opening and closing, and it agrees not to ask witnesses whether Defendant "kidnapped" the victim. Dkt. No. 45 at 2. Given these considerations, Defendant's request is DENIED.

**C. Usage of "Victim"**

Next, Defendant seeks to prohibit the Government and its witnesses from referring to C.M. or D.G. as "victims." Dkt. No. 42 at 10. Several courts have recognized that the repeated use of the term "victim" may be prejudicial.[2] Other courts have acknowledged that use of the term

---

[2] *See United States v. Sena*, No. 19-CR-01432, 2021 WL 4129247, at *1 (D.N.M. Sept. 9, 2021) (recognizing that the term "victim" "is prejudicial when the core issue at trial is whether a crime has been committed—and, therefore, whether there is a victim."); *Connecticut v. Cortes*, 851 A.2d 1230, 1239-40 (Conn. App. Ct. 2004), *aff'd*, 885 A.2d 153 (Conn. 2005) (holding that jury charges using the term "victim" instead of "alleged victim" violated a defendant's due process right to a

"victim" holds limited probative value. *See United States v. Garcia-Limon*, No. CR 21-0032 RB, 2022 WL 3334498, at *1 (E.D. Okla. May 16, 2022) ("Moreover, there is virtually no probative value in allowing the government to use the term 'victim' to describe [the individual]."); *see also United States v. Ehrens*, No. CR-15-200-C, 2015 WL 7758544, at *2 (W.D. Okla. Dec. 1, 2015) (finding that there was "no need by any party to refer to [the alleged victim] by any particular descriptor other than her name")). Based on these authorities, the Court prohibits the Government from referring to D.G. as a "victim" at all during trial because Defendant is not charged with an offense against D.G. Furthermore, the Court prohibits the Government from referring to C.M. as a "victim" in opening statements or throughout the presentation of evidence. However, because the Government may argue in closing that it has met its burden to establish Defendant's guilt, it would not be unfairly prejudicial to allow the Government to follow this argument to its logical conclusion by referring to C.M. as a "victim." So, the Government may use "victim" in closing argument only. Therefore, this request is GRANTED IN PART and DENIED IN PART.

**D. References to "Domestic Violence" and "Domestic Abuse"**

Penultimately, Defendant asks that no references be made to "domestic violence" or "domestic abuse" or related evaluations made by police officers. Dkt. No. 42 at 11. Outside of generally objecting to those terms, Defendant specifically objects to three specific pieces of discovery. The first is a document from SPD, which refers to a "Lethality Assessment" being given to C.M. on November 15, 2025, after law enforcement stopped her and Defendant. The second

---

fair trial); *Talkington v. Texas*, 682 S.W.2d 674, 674 (Tex. App. 1984) (holding that the use of the term "victim" in court's rape charge was reversible error when the issue at trial was whether complainant consented to sexual intercourse); *New York v. Davis*, 423 N.Y.S.2d 229, 230 (N.Y. App. Div. 1979) ("By referring in its charge to the complainant as the 'victim' and to the defendant as the 'perpetrator', the court impermissibly insinuated to the jury that the complainant was the victim of injuries resulting from acts committed by the defendant.").

and third are an "Intimate Partner Lethality Assessment Form for Law Enforcement," and a "Seminole County Domestic Violence Medical Evaluation Form," both of which C.M. completed. Defendant argues that he was not charged with domestic violence, that these forms are irrelevant, and that referencing "domestic abuse" or "domestic violence" would be highly prejudicial.

The Government agrees not to offer these documents in its case-in-chief unless Defendant opens the door. Dkt. No. 45 at 4. Furthermore, before offering these forms, the Government promises to approach the bench to discuss their admission with the Court. Both assurances are sufficient for the Court at this time. Without knowing the full context of these forms, the Court will not exclude them prior to trial. Although, this request is DENIED, Defendant may reraise it at the appropriate time during trial.

Additionally, the Court agrees with the Government that law enforcement should be able to use the terms "domestic violence" or "domestic abuse" when testifying about their investigation. Defendant has not moved to exclude the existence of Defendant and C.M. romantic relationship. And for good reason—such evidence would be admissible as intrinsic to the offenses and highly relevant to Defendant's motive to kidnap C.M. So, after learning that fact, it would not surprise, confuse, or inflame a juror to hear that law enforcement might have investigated the offenses as taking place within the context of domestic violence or abuse. Because the relevancy of officers' explanation of their own investigation outweighs any minimal prejudice, this request is DENIED.

**E. References to D.G.'s Head Injury**

Finally, Defendant seeks to exclude descriptions of D.G.'s head injury, photographs of blood on D.G., photographs of D.G.'s blood in Stillwell's apartment, and photographs of D.G. in a hospital or other medical setting. Dkt. No. 42 at 12. In support, Defendant argues this evidence is irrelevant and prejudicial, especially because he is not charged with assaulting D.G. *Id.* In

response, the Government argues this evidence is "intrinsic to the offense and highly probative of the allegations contained in the Indictment." *Id.*

As explained earlier, D.G.'s assault in the apartment is intrinsic to the offense. So, evidence establishing that Defendant assaulted D.G. and caused him to sustain a head injury is highly probative. The Government may prove those facts through D.G.'s testimony at trial and through photographs and recordings of the apartment because that is where the alleged kidnapping was initiated. If D.G.'s blood appears in those photographs and recordings, it is there as an intrinsic part of the kidnapping and law enforcement's investigation. Even though this evidence would prejudice Defendant because he was not charged with assaulting D.G., this prejudice does not substantially outweigh the high probative value of establishing the immediate context of the alleged kidnapping. So, Defendant's request to exclude this evidence is DENIED. Defendant's remaining objections will be reserved until trial.

## **CONCLUSION**

IT IS THEREFORE ORDERED that Defendant's objections [Dkt. No. 37] to the Government's Notice [Dkt. No. 23] are SUSTAINED IN PART and OVERRULED IN PART.

IT IS FURTHER ORDERED that Defendant's Motion in Limine [Dkt. No. 42] is GRANTED IN PART, DENIED IN PART, and HELD IN ABEYANCE IN PART.

Dated this 9th day of November, 2026.

JOHN F. HEIL, III
CHIEF UNITED STATES DISTRICT JUDGE